IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| R.P.,[1] § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | 6:24-CV-55-BR |
| § | |
| COMMISSIONER, § | |
| SOCIAL SECURITY ADMINISTRATION, § | |
| § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER
## VACATING AND REMANDING THE DECISION OF THE COMMISSION

Pursuant to 42 U.S.C. § 405(g), Plaintiff R.P. ("Plaintiff") seeks judicial review of the decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("SSA") for lack of disability. (ECF 1; *see also* ECF 11-1 at 19). Before the Court is Plaintiff's Opening Social Security Brief, (ECF 12), the Commissioner's Response, (ECF 13), and Plaintiff's Reply, (ECF 14). After considering the pleadings, briefs, and administrative record, the Court VACATES and REMANDS the Commissioner's decision.

### I.    PROCEDURAL BACKGROUND

Plaintiff filed a claim for a period of disability and disability insurance benefits on July 7, 2022, alleging disability beginning October 5, 2018, due to osteoarthritis of the shoulders, hips, feet and

---

[1] It is the undersigned's practice to identify the plaintiff using only the first and last initial in filings in social security disability cases. This ensures that the public maintains access to the opinions (in compliance with Rule 5.2(c)(2)(B) of the Federal Rules of Civil Procedure and the E-Government Act of 2002) while still protecting the privacy of non-government parties' identities within the opinion.

knee, degenerative disc disease of the lumbar and cervical spine, obesity, diabetes mellitus, post-traumatic stress disorder, borderline personality disorder, and adjustment disorder. (ECF 11-1 at 24-25). Plaintiff was 46 years old on the date last insured and has at least a high school education. (ECF 11-1 at 29).

Plaintiff's application was initially denied on May 3, 2023, and subsequently denied upon reconsideration on July 14, 2023. (ECF 11-1 at 22). After Plaintiff filed a written request for a hearing, the Administrative Law Judge ("ALJ") held an online video hearing on January 10, 2024. (*Id.*) The ALJ issued an unfavorable opinion on April 17, 2024, denying Plaintiff's claim, and finding that Plaintiff "was not under a disability within the meaning of the Social Security Act from October 5, 2018, through the date last insured." (*Id.* at 23).

The Appeals Council denied Plaintiff's request for review on June 14, 2024. (*Id.* at 5). Therefore, the ALJ's decision is the Commissioner's final decision and is properly before the Court for review. *See* 42 U.S.C. §§ 405(g), 1383(c); *Kneeland v. Berryhill*, 850 F.3d 749, 755 (5th Cir. 2017) ("[C]ourts generally agree that when the Appeals Council denied a request for review, the ALJ's decision becomes the Commissioner's final decision.") (quoting *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005)).

## II.   STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382(c)(a)(3)(A), 423(d)(1)(A) (2012). "'Substantial gainful activity' is defined as a work activity involving

2

significant physical or mental abilities for pay or profit." *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th Cir. 2002); 20 C.F.R. § 404.1572(a)–(b).

When reviewing disability determinations made by the Commissioner, the court is "limited to two inquiries: whether substantial evidence supports the ALJ's decision, and whether the ALJ applied the proper legal standards when evaluating the evidence." *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012). Substantial evidence is defined as "such relevant evidence as a responsible mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

To determine whether substantial evidence of disability exists, the court must consider four elements of proof: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive. The reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). "The Court may not reweigh the evidence or substitute its judgment for that of the Commissioner." *Hernandez v. Comm'r of Soc. Sec.*, No. SA-23-CV-00633-ESC, 2024 WL 4126699, at *1 (W.D. Tex. Sept. 5, 2024).

Conflicts in the evidence are resolved by the Commissioner, not the courts. *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977). "Reversal is inappropriate if the agency's error was harmless—if it is inconceivable that a different administrative conclusion would have been reached even if the ALJ did not err." *Moreno v. Comm'r of Soc. Sec. Admin.*, 698 F. Supp. 3d 935,

939 (W.D. Tex. 2023) (cleaned up) (quoting *Keel v. Saul*, 986 F.3d 551, 556 (5th Cir. 2021). Only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence. *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Stated differently, the level of review is not *de novo*. If the court finds substantial evidence to support the Commissioner's decision, the court must uphold the decision. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).

### III. SEQUENTIAL EVALUATION PROCESS

At step one of the five-step sequential evaluation process,[2] the ALJ found that Plaintiff "did not engage in substantial gainful activity during the period from his alleged onset date of October 5, 2018, through his date last insured of December 31, 2023." (ECF 11-1 at 24). At step two, the ALJ found that Plaintiff had the medically determinable impairments of osteoarthritis of the shoulders, hips, feet and knee, degenerative disc disease of the lumbar and cervical spine, obesity, diabetes mellitus, post-traumatic stress disorder, borderline personality disorder, and adjustment disorder. (*Id*. at 24-25). The ALJ found that these medically determinable impairments limit Plaintiff's ability to perform basic work activities. (*Id*.). However, at step three, the ALJ found that

---

[2] "In evaluating a disability claim, the [ALJ] conducts a five step sequential analysis to determine whether (1) the [plaintiff] is presently working; (2) the [plaintiff] has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the [plaintiff] from doing past relevant work; and (5) the impairment prevents the [plaintiff] from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). The plaintiff bears the burden of proof in establishing a disability through the first four steps of the analysis; at the fifth step, the burden shifts to the ALJ and the Social Security Administration to show that there is other substantial work in the national economy that the plaintiff is capable of performing. *Id.* at 448; *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014). A finding that the plaintiff is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Copeland*, 771 F. 3d at 923 (citing *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995)); *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987) (citing *Barajas v. Heckler*, 738 F.2d 641, 643 (5th Cir. 1984) (per curiam)). Before proceeding to steps four and five, the Commissioner must assess a claimant's residual functional capacity ("RFC"). *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). RFC is defined as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1).

the severity of Plaintiff's impairment, or combination of impairments, did not meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (*Id*. at 25).

The severity of a claimant's mental impairments is evaluated under 20 C.F.R. § 416.920a: "At steps two and three of the sequential analysis, ALJs utilize the [psychiatric-review technique] to evaluate the severity of a claimant's mental impairment." *Trillo v. O'Malley*, No. EP-23-CV-00320-ATB, 2024 WL 4653190, at *4 (W.D. Tex. Nov. 1, 2024). The ALJ evaluates a claimant's functional limitations by rating a claimant's degree of limitations in four areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; (4) and adapting or managing oneself. 20 C.F.R. § 416.920a(c). The ALJ found that Plaintiff had (1) a mild limitation in understanding, remembering, or applying information; (2) a moderate limitation in interacting with others; (3) a mild limitation in concentrating, persisting, or maintaining pace; and (4) a mild limitation in adapting or managing oneself. (ECF 11-1 at 26).

Prior to step four, the ALJ must first determine Plaintiff's residual functional capacity ("RFC"). *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). The RFC is the most a claimant can still do despite their limitations. 20 C.F.R. § 404.1545(a)(1). Regarding a claimant's mental RFC, the ALJ "must assess the claimant's abilities to carry out certain mental activities in a work setting such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, co-workers, and work pressures." *Trillo*, 2024 WL 4653190, at *4 (cleaned up) (quoting 20 C.F.R. § 416.945(c)). The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (ECF 11-1 at 28). However, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the medically determinable symptoms were not "entirely consistent with the

medical evidence and other evidence in the record." (*Id*.). Thus, the ALJ determined that Plaintiff can perform

> light work as defined in 20 CFR 404.1567(b) except he could occasionally balance, stoop, kneel, crouch, and climb ramps or stairs; he should never crawled or climbed [sic] ladders, ropes, or scaffolds; he could understand, remember, and carry out simple tasks and instructions; and he could have occasional interact[ion] with coworkers, supervisors, and the public.

(*Id*. at 27). At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.

(*Id*. at 33). At step five, the ALJ determined that Plaintiff

> had the residual functional capacity to perform light work…except he could occasionally balance, stoop, kneel, crouch, and climb ramps or stairs; he should never crawled or climbed [sic] ladders, ropes, or scaffolds; he could understand, remember, and carry out simple tasks and instructions; and he could have occasional interact [ion] with coworkers, supervisors, and the public.

(*Id*.). Specifically, the ALJ referenced occupations such as cleaner/housekeeper, routing clerk, and inspector/hand packer. (*Id*. at 34).

## IV. MEDICAL BACKGROUND

### A. Medical Evidence

Plaintiff alleges disability for mental impairments beginning in October 2018. In 2018, "he stopped working due to psychologically based symptoms but was not yet receiving mental health treatment. He testified he was afraid to ask for help." (ECF 11-1 at 27-28). Thus, unsurprisingly, the ALJ notes that "the records show little evidence of treatment dating that far back." (*Id*.).

Plaintiff testified that he began to receive mental health treatment in May 2020 and "was assessed with adjustment disorder with anxiety and prescribed Fluoxetine, Buspar, and Divalproex." (*Id*.); (*see also* ECF 12 at 5) ("His mental status exam was significant for an anxious and irritable mood. During psychotherapy sessions, Plaintiff reported high anxiety, fear, intense anger, feelings of worthlessness and helplessness."). The ALJ notes that in May 2020

psychotherapy session(s), Plaintiff "denied homicidal ideation, suicidal ideation, and psychotic symptoms." (ECF 11-1 at 28). However, in July 2020, Plaintiff "called the Veteran's Crisis line with suicidal ideation due to financial and family issues." (ECF 12 at 5) (citing ECF 11-1 at 2130). The same day as the call to the crisis line, Plaintiff self-presented to an emergency room and was then admitted for nine days. (ECF 11-1 at 1625).

From August 2020 to December 2020, Plaintiff attended virtual counseling appointments at the VA with moods that shifted from dysthymic to euthymic. (*Id*. at 1546; 1548; 1591-1596; 1574; 1560) (noting diagnosis as adjustment disorder). During a November 2020 Mental Health Telephone Encounter with the VA, Plaintiff "felt better…but wished to continue therapy for anxiety and anger management." (ECF 12 at 6); (ECF 11-1 at 1560).

In a December 21, 2020, Mental Health Outpatient visit, Plaintiff's mood was described as "stable" and, contrary to self-reporting at the August 2020 through December 2020 counseling appointments, he denied having sad periods, anxiety, and reported minimal irritability. (ECF 11-1 at 1532). Plaintiff reported he "is not taking any of his psychiatric medications x [sic] few months. He feels better off medications." (*Id*. 1534) (noting diagnosis as adjustment disorder with anxiety). Then, at a January 2021 VA counseling session, Plaintiff reported feeling well, that he did not want to take medication anymore, and "decided he does not need psychiatry services at this time." (*Id*. at 1531) (noting diagnosis as adjustment disorder). At a follow-up session in February 2021, Plaintiff stated he was doing well and that he "does not think he needs counseling at this time." (*Id*. at 1519). The counselor "agreed to terminate therapy as [Plaintiff's] reports are positive." (*Id*.) (noting diagnosis as adjustment disorder).

Then eight months later, on August 30, 2021, Plaintiff called the VA National Suicide Prevention Hotline. (*Id*. at 1411). However, during a September 14, 2021, Mental Health

Telephone Encounter, Plaintiff reported "he is doing well off medications." (*Id*. at 1405) (noting diagnosis of adjustment disorder with anxiety). On September 29, 2021, Plaintiff self-presented to a community emergency facility for suicidal ideation, but he was not admitted. (*Id*. at 1413).

At a December 2021 Mental Health Medication Management meeting, Plaintiff "reported his mood was bad and endorsed depressed mood and irritable mood nearly every day since July [2021]." (ECF 12 at 6); (ECF 11-1 at 1359-62) ("[Plaintiff] endorses anger outbursts but said he normally does not experience crying spells, although admits to have a crying episode 'the other night I had a big one.'…[Plaintiff] said a few people in his life 'hate me.'"). At this meeting, Plaintiff expressed a willingness to try mood and anxiety medication again. (ECF 11-1 at 1362). Notes from a January 2022 Mental Health Medication Management meeting indicate that Plaintiff denied any aggressive behaviors or suicidal thoughts but expressed that he is "not doing too well." (*Id*. at 1345-50) (noting diagnosis of adjustment disorder).

During 2022 and 2023, Plaintiff was hospitalized six times for suicidal ideation. (*Id*. at 56). In February 2022, Plaintiff self-presented to a VA clinic with, amongst other things, "increased depressed mood…increased anxiety, increased irritability/anger" over a four-day period. (*Id*. at 1340). Plaintiff reported having suicidal thoughts and that "due to his racing thoughts he cannot guarantee that he won't go home and harm himself." (*Id*. at 1336). Plaintiff stated that he was taking mood and anxiety medication as prescribed. (*Id*. at 1340). He was then admitted to the VA hospital. (ECF 11-1 at 1313); (*see also id*. at 350) (noting diagnosis at discharge of adjustment disorder with disturbance of conduct and borderline personality disorder).

At a March 2022 Mental Health Medication Consult, Plaintiff stated that the

> recent [February 2022] psychiatric hospitalization was very helpful…escitalopram didn't have enough time to work the way it should. Going there gave it time to work without having too much pressure on me….[Plaintiff] said he continues to live with constant anxiety on a daily basis….not as hypervigilant.

8

(*Id*. at 939). Plaintiff attended two mental health treatment planning sessions in March 2022, but the record does not indicate that he received individual therapy in March 2022. (*Id*. at 968).

By May 2022, Plaintiff had again self-presented to a VA clinic "requesting to be seen by a MH [Mental Health] provider….[Plaintiff] states he is having suicidal thoughts with plan to cut self and take pills." (*Id*. at 919); (*see also id*. at 343) (noting diagnosis at discharge of adjustment disorder with mixed emotional features and borderline personality disorder). At a September 2022 VA Mental Health Consult, Plaintiff shared he had recently self-admitted to West Oaks Hospital for roughly five days: "Despite being admitted, today he stated that he never had a specific plan or intent to harm himself." (*Id*. at 361-363) (noting treatment goals of focusing on depression and interpersonal conflict.).

According to Plaintiff's testimony, in February, June, and November of 2023, he "had been hospitalized at the VA for mental health issues." (*Id*. at 30; *see also id*. at 53). However, the record "does not contain any treatment notes from those hospitalizations." (*Id*. at 30). Plaintiff testified that each stay lasted six days and resulted in him seeing a "a mental care team, a psychiatrist, psychologist, social worker." (*Id*. at 53). Additionally, Plaintiff reports that absent from the record are additional stays at West Oaks Hospital and HCA Conroe. (ECF 12 at 17).

### B. Medical Opinions

"[T]he only medical opinions of record are those of the state agency experts. The state agency psychologists opined that [Plaintiff's] PTSD was non severe." (ECF 11-1 at 32). The first consultant, Byron T. Pack, found Plaintiff had a non-severe mental impairment. Therefore, Mr. Pack did not assess Plaintiff's mental RFC. (*Id*. at 72). The second consultant, Michael Plasay, Ph.D., affirmed Mr. Pack's findings. Thus, Dr. Plasay did not assess Plaintiff's mental RFC either. (*Id*. at 78).

The ALJ found the two consultants findings "somewhat persuasive" as both opinions were consistent with each other and with medical records "which do not document substantial memory, attention, or other cognitive deficits, despite extensive non-compliance with prescribed treatment." (*Id*. at 32). However, the ALJ found that Plaintiff "does have severe mental health impairments and [is] limited to performing simple tasks and instructions with no more than occasional interaction with others." (*Id*.).

To support this finding, the ALJ determined that the two state agency psychological consultants "did not consider the claimant's adjustment disorder or borderline personality disorder" and hospitalization treatment notes that "reflect difficulty interacting with others." (*Id*.).

## V.     ANALYSIS

At issue is whether the ALJ formulated Plaintiff's mental RFC without supporting medical opinions and, if so, whether such a formulation constitutes a reversible error. Plaintiff argues that the ALJ's mental RFC determination is not supported by substantial evidence because the ALJ, having rejected the state agency psychological consultants' conclusions and Plaintiff's subjective complaints, created a mental RFC determination without support from any medical opinion or other evidence. (ECF 12 at 18-22).

### A. The ALJ Implicitly Rejected the State Agency Psychological Consultants' Opinions and Formulated the Mental RFC without Substantial Evidence.

The Commissioner asserts that "substantial evidence supports the ALJ's Mental RFC finding" arguing that finding is "an administrative assessment – based on the totality of the evidence….The ALJ has the final responsibility for determining an individual's RFC based on all of the relevant medical and other evidence." (ECF 13 at 3) (citing *Ripley v. Chater,* 67 F.3d 552, 553 (5th Cir. 1995)). Nevertheless, judicial review of the ALJ's decision is based on whether there is substantial

evidence to support the ALJ's RFC determination. *White v. Comm'r of Soc. Sec.*, No. 4:22-CV-00019-JMV, 2022 WL 4466920, at *2 (N.D. Miss. Sept. 26, 2022).

Substantial evidence is not automatically derived from an ALJ's totality of the evidence analysis. In *Ripley*, the claimant argued "that the ALJ failed to develop the record fully and fairly" in making the RFC determination as "there was no medical testimony supporting [the] conclusion." 67 F.3d at 557. However, according to *Ripley*, the absence of a medical opinion is not fatal to an ALJ's formulation of an RFC. *Id*. When no medical statement is provided, a court's "inquiry focuses upon whether the decision of the ALJ is supported by substantial evidence in the existing record." *Id.*

Substantial evidence has little to do with the volume of the record but, rather, requires that the record clearly establish the effect of a claimant's condition on their ability to work. *Id.* In *Ripley*, though the record included "a vast amount of medical evidence" establishing that the claimant had a severe condition, "[t]he only evidence regarding Ripley's ability to work came from Ripley's own testimony." *Id*. Therefore, the court remanded as "the ALJ's conclusion was not supported by substantial evidence." *Id*.

The same is true in the present matter: in applying *Ripley*'s substantial evidence standard, the Court finds that the record does not clearly establish the effect Plaintiff's condition had on his ability to work. *See Ripley*, 67 F.3d. at 557. Neither state agency psychological consultant assessed Plaintiff's ability to work. (ECF 12 at 11; *see also* ECF 11-1 at 72,78). The Court agrees with Plaintiff's assertion that the ALJ implicitly rejected the state agency psychological consultative examiners' opinions and then substituted his own medical judgment to determine Plaintiff's mental RFC. (*See* ECF 12 at 8) (quoting *Silves H. v. Kijakazi*, No. 3:22-CV-286-K-BN, 2022 WL

17345924, at *10 (N.D. Tex. Nov. 14, 2022), *rec. adopted,* No. 3:22-CV-286-K-BN, 2022 WL 17345778 (N.D. Tex. Nov. 30, 2022)).

In *Silves H.*, the claimant argued that "the ALJ did not identify any medical opinion, medical evidence, or other evidence as the basis for her determination that [the claimant] could frequently handle and finger bilaterally and instead impermissibly substituted her own medical judgment to determine [the claimant's] ability to work." 2022 WL 17345924, at *2. In *Silves*, as in this case, "the only medical opinions in the record were those of the State Agency Medical Consultants ["SAMCs"]." *Id*. at *3; (*see also* ECF 12 at 11). The *Silves* ALJ "found the SAMCs opinions to be somewhat persuasive, with the opinion on reconsideration being more persuasive." 2022 WL 17345924, at *3. The ALJ determined that Silves had manipulative limitations in handling and fingering where the SAMCs found none. *Id*. Because the ALJ did not explain the reasoning or "identify any medical or other evidence as the basis for her finding…the ALJ implicitly rejected the SAMCs opinions by finding that [Silves] had manipulative limitations." *Id*.

Similarly, in the present matter, neither state agency psychological consultant assessed Plaintiff's ability to work. However, the ALJ, based on his unsupported opinion, added additional limitations to account for Plaintiff's adjustment disorder and borderline personality disorder. (ECF 11-1 at 32). This constitutes an implicit rejection of the medical opinions because the state agency psychological consultants neither assessed Plaintiff's mental RFC, nor accounted for Plaintiff's adjustment disorder and borderline personality disorder. Therefore, the basis for the ALJ's finding does not rise to the level of substantial evidence.

1. **Raw Medical Evidence**

Unlike the ALJ in *Silves*, here the ALJ identified other medical evidence as the basis for his findings. The ALJ relied on medical records to conclude that Plaintiff did not have "significant

memory, attention, or other cognitive deficits" and to observe Plaintiff's non-compliance with prescribed treatment— "[t]he medical records, however, are most prominent for nearly continuous, and volitional, non-compliance with prescribed treatment." (*Id*. at 28). However, absent medical opinions that assessed functional limitations, the ALJ's reliance upon the medical evidence amounts to interpreting raw medical evidence to formulate the mental RFC. *See Antonio A. v. O'Malley*, No. 3:23-CV-00449-BT, 2024 WL 495260, at *5 (N.D. Tex. Feb. 7, 2024) ("No treating, examining, or consultative source offered any opinion on the effect Plaintiff's...complicated eye condition—had on his ability to work....[the ALJ] improperly relied on his own interpretation of the raw medical data and Plaintiff's testimony.").

Raw medical evidence is "evidence that does not permit common-sense judgments about functional capacity and instead requires the ALJ to overstep the bounds of a lay person's competence and render a medical judgment." *Moore v. Saul*, No. 3:20CV161-MPM-JMV, 2022 WL 987735, at *2 (N.D. Miss. Mar. 31, 2022) (cleaned up) (quoting *Minor v. Astrue*, No. 1:13cv17-HSO-RHW, 2014 WL 936438, at *6 (S.D. Miss. March 10, 2014)). "An ALJ cannot look to only the claimant's history of surgery, medical examinations, and complaints of pain, and conclude the claimant can perform sedentary work." *Antonio A.*, 2024 WL 495260, at *5 (cleaned up) (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)) (collecting cases). Consequently, the ALJ's reliance on medical evidence amounts to interpreting raw medical data and is, therefore, an insufficient substitute for a medical opinion. Here, Plaintiff's subjective statements during mental health treatment appointments account for the majority of the ALJ's assessment of the medical evidence. When Plaintiff's subjective statements are removed from the ALJ's assessment, the amount of actual medical evidence from mental health providers is minimal. (ECF 11-1 at 28-30) (noting that the ALJ's assessment only recounts medical evidence from a mental health

provider in stating occasionally that, during appointments, Plaintiff had "good eye contact, euthymic affect, fair judgment, and insight."). By interpreting Plaintiff's subjective statements within mental health treatment records without the assistance of medical opinions the ALJ played the role of mental health provider. This constitutes the interpretation of raw medical evidence. Because the ALJ had implicitly rejected the state agency psychological consultants' opinions, and the record contained no medical opinions that assessed functional limitations, the ALJ interpreted raw medical evidence to determine the severity of Plaintiff's PTSD, borderline personality disorder, and adjustment disorder using his own "common-sense judgments about functional capacity." *Moore v. Saul*, No. 3:20CV161-MPM-JMV, 2022 WL 987735, at *2 (N.D. Miss. Mar. 31, 2022).

2. **Non-compliance with Prescribed Treatment**

The ALJ's determination of Plaintiff's RFC overemphasized Plaintiff's non-compliance without a balanced SSR 16-3p analysis. Plaintiff asserts that "[t]he ALJ failed to properly evaluate this non-compliance against SSR 18-3p or SSR 16-3p." (ECF 12 at 13). The Commissioner counters that the ALJ "did not need to do this [SSR 18-3p] analysis because the ALJ properly found [Plaintiff] was not disabled." (ECF 13 at 7). However, there are times that, despite an ALJ's finding that a claimant is not disabled, an ALJ makes an implicit determination of non-compliance absent "the safeguards" set forth in SSR 18-3p. *Henson v. Comm'r of Soc. Sec.*, No. 7:20-CV-00145-O-BP, 2021 WL 8776794, at *3 (N.D. Tex. Dec. 14, 2021), *report and recommendation adopted sub nom. Henson v. Commisioner of Soc. Sec.*, No. 7:20-CV-00145-O-BP, 2022 WL 2078211 (N.D. Tex. June 9, 2022).

Therefore, *Henson* provides three inquiries to determine if an ALJ properly considered non-compliance:

14

> (1) did the ALJ determine compliance at the proper time; (2) if not, did the ALJ consider non-compliance as part of a credibility determination; and (3) if no to both (1) and (2), was the consideration of non-compliance substantial enough to rise to the level of an 'implicit determination,' such that the ALJ erred in not adhering to SSR 18-3p?

*Id*. In applying *Henson*, the Court finds that the ALJ considered Plaintiff's non-compliance as part of a credibility determination. (ECF 11-1) ("I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent…based on the requirements of …SSR 16-p."). Thus, the Court turns to the ALJ's SSR 16-3p analysis.

Under a SSR 16-3p analysis, according to the Commissioner, the "ALJ properly considered Plaintiff's non-compliance with medication as one factor of his evaluation of [Plaintiff's] subjective symptoms." (ECF 13 at 7). That regulation outlines the "factors to consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms." SSR 16-3p(2)(d). The regulation states that "if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id*. However, the ALJ is to consider the "possible reasons [a claimant] may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id*. The ALJ may inquire, at an administrative proceeding, why a claimant "has not complied with or sought treatment in a manner consistent with his or her complaints." *Id*.

The ALJ must consider the claimant's treatment history and may also consider factors including, but not limited to: (1) whether an "individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms" (2) whether "various limitations (such as language or mental limitations)" indicate that "an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment" (3) whether a claimant's "mental impairment (for example, individuals with mental

15

impairments that affect judgment, reality testing, or orientation)" indicate that "an individual may not be aware that he or she has a disorder that requires treatment." *Id*.

Though the ALJ addresses Plaintiff's concern of possible side effects, this is the extent of the application of the SSR 16-3p factors. (ECF 11-1 at 28-30; 32). This belies the nuance of the record that frequently reflects Plaintiff's inconsistent awareness regarding any alleged effectiveness of medication compliance. (*Id*.). The ALJ gave no consideration to Plaintiff's understanding or awareness that he has a disorder that requires treatment. For example, Plaintiff testified at the hearing:

> I put it in my head that I take the meds, I still get depressed, you know, things don't happen that make me feel depressed, what's the point of taking the medication. You know, if I don't think something's going to work, I don't see the point. So, that's why I stopped back then.

(*Id*. at 53). Plaintiff's response reflects a lack of awareness that merits analysis under SSR 16-3p(2)(d).

Further, the ALJ did not *"consider and address reasons for not pursuing treatment that are pertinent to an individual's case."* SSR 16-3p(2)(d). Nor did the ALJ "review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them." *Id*. Additionally, the ALJ did not explain how he "considered the individual's reasons in [the ALJ's] evaluation of the individual's symptoms." *Id*. When the ALJ inquired at the proceedings about Plaintiff's non-compliance, Plaintiff provided answers that the ALJ did not consider in the evaluation. (ECF 11-1 at 52, 53, 55, and 56).

The Commissioner argues that the ALJ's findings as to Plaintiff's mental RFC are not an improper substitution of his own lay opinion because "the ALJ reviewed the record as a whole." (ECF 13 at 4). However, the ALJ's review of the record was heavily dependent upon the review

of physiological medical records that overly emphasized Plaintiff's non-compliance without a balanced SSR 16-3p analysis.

### 3. Plaintiff's Description of Daily Activities and Interaction with Others

The ALJ also considered Plaintiff's testimony. *See McBride v. O'Malley*, No. 4:22-CV-985-SDJ, 2024 WL 1308001, at *11 (E.D. Tex. Mar. 26, 2024 ("An ALJ may rely on the claimant's testimony to determine how an impairment affects his ability to work."). Plaintiff argues that the ALJ failed to appropriately contextualize Plaintiff's daily activities and failed to adequately explain how those supported the ALJ's mental RFC determination. For example, the ALJ describes Plaintiff as having "reported no problems caring for his own hygiene or preparing simple meals…could do laundry, clean, and drive." (ECF 11-1 at 31). However, Plaintiff argues that the ALJ omitted crucial details that cut against the mental RFC determination, such as the fact that the simple meals consisted of "sandwiches, burgers, pasta dishes, frozen dinners" and that, regarding simple chores, Plaintiff "needs encouragement from his wife to do this sometimes." (ECF 12 at 15)

Plaintiff also contends that the ALJ failed to appropriately contextualize Plaintiff's interaction with others to support the mental RFC determination. (*Id*. at 13). The ALJ, in finding that Plaintiff's "daily activities are generally inconsistent with a debilitating condition," states that though Plaintiff "reported irritability and difficulty getting along with others," he could still "go out alone and go to church regularly." (ECF 11-1 at 31). Plaintiff asserts that the ALJ's description of Plaintiff's going out alone and of regularly going to church "ignores probative evidence" regarding his interaction with others. (ECF 12 at 16). For example, Plaintiff claims that he only goes out alone occasionally. (*Id*.). Additionally, Plaintiff argues, in essence, his church attendance reflects a checkered past of interpersonal difficulties that, for example, resulted in one church

placing boundaries on Plaintiff's participation. (*Id*. at 15-16; *see also* ECF 11-1 at 3391) ("[H]e reported that he has had to leave two churches; in the first, after being asked to step down from participation in the choir and to attend a class for 'special needs adults', he got into an argument with another church member."); (*Id*. at 3165, 3178). Absent sufficient support from medical opinions and other medical evidence, the Court is not convinced that Plaintiff's testimony forms the basis for substantial evidence from which the ALJ can form a mental RFC.

The ALJ implicitly rejected the medical opinions and instead, relied upon raw medical evidence to substitute for medical opinions. Furthermore, the ALJ's consideration of Plaintiff's non-compliance and Plaintiff's testimony is insufficient to fill the gaps created by the absence of medical opinions. Thus, there is not substantial evidence to support his decision. The Court is mindful that it may not either substitute its own judgment for that of the Commissioner or reweigh evidence. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980); *Hernandez v. Comm'r of Soc. Sec.*, No. SA-23-CV-00633-ESC, 2024 WL 4126699, at *1 (W.D. Tex. Sept. 5, 2024). Nevertheless, the present matter is not one wherein the Court is reweighing evidence, but one in which substantial evidence is not present. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (Substantial evidence is "such relevant evidence as a responsible mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance.").

### B. The ALJ's Error Prejudiced Plaintiff

Conflicts in the evidence are resolved by the Commissioner, not the courts. *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977). "Reversal is inappropriate if the agency's error was harmless—if it is inconceivable that a different administrative conclusion would have been reached even if the ALJ did not err." *Moreno v. Comm'r of Soc. Sec. Admin.*, 698 F. Supp. 3d 935, 939 (W.D. Tex. 2023) (cleaned up) (quoting *Keel v. Saul*, 986 F.3d 551, 556 (5th Cir. 2021).

Procedural perfection in administrative proceedings is not required." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Thus, a court "will not vacate a judgment unless the substantial rights of a party have been affected." *Id*. A plaintiff must "demonstrate prejudice resulting from the ALJ's errors." *Allen v. Saul*, No. 4:19-CV-1575, 2020 WL 5412630, at *7 (S.D. Tex. Sept. 9, 2020) (citing cases). "Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008).

As Plaintiff argues, the ALJ's error prejudiced Plaintiff. (ECF 12 at 21-22). Regarding Plaintiff's mental RFC, the only medical opinions of record, which the ALJ implicitly rejected, did not assess Plaintiff's mental RFC. The ALJ prejudiced Plaintiff by formulating a mental RFC without a supporting medical opinion, and without support from substantial evidence.

## VI. CONCLUSION

For the reasons stated above, the Court VACATES and REMANDS the Commissioner's decision.

**IT IS SO ORDERED.**

**ENTERED April 28, 2025**.

_____
LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE